The Honorable Gerald Lewis Comptroller The Capitol Tallahassee, Florida 32399-0350
Mr. Milton J. Wallace, Chairman Housing Finance Authority of Dade County 44 West Flagler Street, Suite 2080 Miami, Florida 33130
Dear Gentlemen:
You have asked substantially the following question:
Does Ch. 159, F.S., grant housing authorities created thereunder the authority to establish, wholly own and operate a state-chartered savings bank?
In sum, I am of the opinion:
Housing authorities created pursuant to Ch. 159, F.S., are not authorized to establish, wholly own and operate a state-chartered savings bank.
According to your letter, the Department of Banking and Finance, as strong advocates of public housing, support the efforts of the Housing Finance Authority of Dade County to pursue all available methods of providing financial services to South Florida citizens. Moreover, the department recognizes the necessity of innovative approaches to public housing financing is particularly important due to the impact of the savings and loan crisis on the availability of funds. However, the department has raised a question regarding the authority's ability to start and run a savings bank. Accordingly, the department and the authority have requested the opinion of this office on this issue.
Part IV, Ch. 159, F.S., the Florida Housing Finance Authority Law,[1] empowers each county to create a housing finance authority (HFA) in the county as a separate body corporate and politic to carry out the powers granted in the act.[2] This office has been advised that the Housing Finance Authority of Dade County was established in 1979 for the purpose of alleviating a shortage of affordable housing in Dade County.
In creating the housing financing law, the Legislature determined that the shortage of housing and capital for investment in hous-ing in this state was a threat to the "health, safety, morals, and welfare" of the residents of this state and could not be relieved except through the encouragement of investment by private enterprise.[3] Thus, the Legislature expressly declared:
The financing, acquisition, construction, reconstruction, and rehabilitation of housing and of the real and personal property and other facilities necessary, incidental, and appurtenant thereto are exclusively public uses and purposes for which public money may be spent, advanced, loaned, or granted and are governmental functions of public concern.[4]
To accomplish these purposes, HFA's possess the authority to issue bonds[5] and to make and execute contracts.[6] They are authorized to make loans directly to persons or families qualified under the act to receive assistance and "[t]o own real and personal property acquired through the use of surplus funds or through public and private partnerships provided that the obligations of the authority are limited to project revenues and no less than 50 percent of the units owned by a [HFA] shall benefit very low-income families or low-income families."[7]
The HFA's are further authorized to make loans to lending institutions to be used by such institutions for the making of new mortgages for qualifying housing developments, and:
To deposit funds into an account with a lending institution to provide security for the lending institution to make loans to eligible persons for the purchase, construction, reconstruction, or rehabilitation of single-family homes or to developers for the construction, reconstruction, or rehabilitation of qualifying housing developments or portions thereof. No funds may be deposited with a lending institution in which any depositing housing finance authority member, officer, or employee has an ownership interest. . . .[8] (e.s.)
As statutorily created entities, HFA's possess only such powers as have been expressly granted or necessarily implied therefrom.[9]
While an express power duly conferred may include the implied authority to use the means necessary to carry out the express power, this office has stated on numerous occasions that such implied authority may not warrant the exercise of a substantive power not conferred.[10] Moreover, any reasonable doubt as to the lawful existence of a particular power sought to be exercised is to be resolved against such an exercise.[11]
I find nothing in Part IV, Ch. 159, F.S., which expressly authorizes a housing finance authority created thereunder to create, own and operate a savings and loan bank, nor can I conclude that such an authority may be implied from those powers expressly conferred on those entities.[12] The power to contract and to hold property does not necessarily encompass the authority to establish, own and operate a bank subject to the conditions and limitations placed on such an entity by the Florida Banking Code. There may be instances in which the duties imposed upon the savings institution by the banking code and those imposed on the HFA pursuant to Part IV, Ch. 159, F.S., may be in conflict.
Accordingly, until legislatively determined to the contrary, I am of the opinion that a housing finance authority created pursuant to Part IV, Ch. 159, F.S., is not authorized to establish, wholly own and operate a state-chartered savings bank.
Sincerely,
Robert A. Butterworth Attorney General
RAB/tjw
[1] Section 159.601, F.S.
[2] Section 159.604(1), F.S.
[3] Section 159.602, F.S.
[4] Section 159.602(3), F.S.
[5] See, ss. 159.612-159.616, F.S. And see, s. 159.602(4), F.S., stating that the Congress has determined that housing may be financed by means of obligations issued by a state or local governmental unit, the interest on which is exempt from federal income taxation and "has thereby provided a method to aid state and local governmental units to provide assistance to meet the need for housing."
[6] Section 159.608(1), F.S.
[7] See, s. 159.608(2) and (8), F.S., respectively.
[8] Section 159.608(5) and (6), F.S. Subsection (6) [then s. 159.508(5)] was added by s. 1, Ch. 88-136, Laws of Florida. During committee hearings on the bill, the language prohibiting a HFA from depositing funds with a lending institution in which a HFA member, officer or employee had an ownership interest was described as a measure to ensure that "no member of a bank board would also have a dual interest with a housing finance authority." Tape 1, Committee on Housing, House of Representatives, May 4, 1988.
[9] See, e.g., AGO 86-13, and authorities cited therein, stating that a housing authority created pursuant to Part I, Ch. 421, F.S., possesses only such authority as granted by statute, either expressly or by necessary implication.
[10] See, e.g., AGO's 78-114, 78-101, and 78-95. And see, Florida State University v. Jenkins, 323 So.2d 597 (1 D.C.A. Fla., 1975) (implied power must be essential in order to carry out the expressly granted power or duty imposed).
[11] State ex rel. Greenberg v. Florida State Board of Dentistry,297 So.2d 628 (1 D.C.A. Fla., 1974), cert. dismissed,300 So.2d 900 (Fla. 1974); City of Cape Coral v. GAC Utilities, Inc., of Florida, 281 So.2d 493 (Fla. 1973). And see, State v. Atlantic Coast Line R. Co., 47 So. 969, 974 (Fla. 1908); Gardinier, Inc. v. Florida Department of Pollution Control, 300 So.2d 75, 76 (1 D.C.A. Fla., 1974), stating that implied powers accorded administrative agencies must be indispensable to powers expressly granted.
[12] An examination of the legislative history surrounding the amendment of s. 159.608(2), F.S., in 1988 which authorized a HFA to own real and personal property acquired through the use of surplus funds or through public or private partnerships, failed to reveal any evidence that the Legislature sought by such amendment to authorize HFA's to establish, own and operate a savings bank. See, e.g., Senate Staff Analysis and Economic Impact Statement on CS/HB 502, Committee on Economic, Community and Consumer Affairs (ECCA), dated May 18, 1988, stating that the amendment "would enable HFA's to acquire properties which might otherwise be converted to some other use other than lowincome housing and would facilitate joint ventures between HFA's and private entities." And see, Tape 3 of 4, Senate ECCA Committee, May 5, 1988, indicating that the impetus for the amendment came from Broward and Orange counties which wished to "actually own a project" and to "purchase section 8 projects where the contracts are expiring.